## No. 17,822.

## Colorado Builders' Supply Company *v.* Hinman Brothers Construction Company and LeTourneau-Westinghouse Company

(304 P. [2d] 892)

Decided December 10, 1956. Rehearing denied December 31, 1956.

384

Messrs. FAIRFIELD AND WOODS, Mr. JAMES A. WOODS, Mr. CHARLES J. BEISE, for plaintiffs in error.

Mr. KENNETH W. ROBINSON, Mr. ROBERT D. CHARLTON, Mr. RICHARD L. SCHREPFERMAN, for defendant in error, LeTourneau-Westinghouse Company.

Messrs. ARBER, SWAIN AND JOHNSON, Mr. TIMOTHY W. SWAIN, of counsel for defendant in error, LeTourneau-Westinghouse.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

WE will refer to the parties as they appeared in the trial court where the Colorado Builders' Supply Company, hereinafter referred to as Cobusco, was plaintiff; the Hinman Bros. Construction Company, hereinafter referred to as Hinman, was defendant; and the LeTourneau-Westinghouse Company, hereinafter referred to as Westinghouse, was third party defendant. We will refer to R. G. LeTourneau, Inc., predecessor in interest of Westinghouse, as LeTourneau, and to Liberty Trucks & Parts Company, as Liberty.

In the complaint of Cobusco it was alleged that, while acting as exclusive distributor for LeTourneau, they sold to Hinman heavy earth-moving equipment and that there was then owing an unpaid balance of $76,000.00. The purchase contract for this equipment was signed in Denver May 20, 1952. Cobusco prayed for judgment in the amount of $76,000.00.

In the answer and counterclaim filed by Hinman, it was denied that they owed a balance, and asked judgment against Cobusco on two counterclaims aggregating $500,000.00. The first of these claims was based on an alleged breach of warranty, and the second was based on misrepresentation concerning the equipment which was purchased.

Cobusco then filed its third party complaint against Westinghouse who had meanwhile purchased the equipment business of LeTourneau and had assumed its obligations. It was alleged that service of process could not be obtained in Colorado upon LeTourneau. Cobusco alleged further that Westinghouse, an Illinois corporation, was engaged in business in Colorado but had not qualified to do business here nor had it designated an agent for process; that LeTourneau had warranted the equipment sold by Cobusco to Hinman to be free from defects of workmanship and materials; that LeTourneau was party to all representations made to Hinman; that on May 9, 1953, LeTourneau sold to Westinghouse its business and as a condition of that sale Westinghouse agreed "to assume the obligations of" LeTourneau, and "to indemnify and hold harmless [LeTourneau] of and from all liabilities accruing on and after May 1, 1953, in respect of * * *" contracts involving the earth-moving equipment business which was sold by LeTourneau and purchased by Westinghouse; and that the sale of equipment by Cobusco to Hinman was one of the customer contracts acquired and assumed by Westinghouse as a part of its purchase of the business from LeTourneau. Cobusco asked judgment against Westinghouse for any and all damages which might be awarded to Hinman upon his counterclaims against Cobusco.

Service of process on Westinghouse was made by personal service in Denver on Vernon C. Slade and H. W. Murphy, each of whom was described in the return of service as "agent and principal employee" of Westing-

house. Westinghouse moved to quash the service of process on the grounds: (1) That it was not engaged in business in Colorado; and (2) that the persons served were not agents for service of process. This motion was supported by affidavits of those served and by the president of Westinghouse, all of whom thereafter testified. Upon application of Cobusco the motion was set down for the taking of evidence. Five witnesses were called and examined at length and numerous exhibits were introduced in evidence.

The trial court determined that Westinghouse was not amenable to process in Colorado and that the motion to quash should be sustained, and entered judgment accordingly. Motion for new trial was dispensed with, and Cobusco, seeking reversal of the judgment, brings the cause to this court for review by writ of error.

Westinghouse was organized May 1, 1953, and as of that date it purchased the earth-moving equipment and assets of LeTourneau. Westinghouse did not engage in selling directly to the public any of the equipment it manufactured; it sold to distributors who in turn dealt with the public. The relationship between Westinghouse and its distributors is contractual. Manufacturing plants were located in Peoria, Illinois, and Toccoa, Georgia. The sales to distributors were completed at either plant and title to the equipment transferred to the distributor at the time the invoice was made. Westinghouse employed district representatives and service engineers. The territory assigned to Harold W. Murphy as district representative, on whom service of process in this case was attempted, consisted of the states of Utah, New Mexico, Wyoming, Arizona, Colorado, and portions of west Texas. He was the only representative of Westinghouse operating in this area during the time in question. Generally, his duties and functions were to advise and counsel distributors in the promotion of sales. He reported to Westinghouse on the progress a distributor was making in merchandising its equipment. He had no

authority to sell Westinghouse products and generally worked through the distributor.

From May 1, 1953, to May 29, 1953, Cobusco was the exclusive distributor for Westinghouse in Colorado and portions of Nebraska and Wyoming. On the date last mentioned this relationship was terminated. One William Barry was the Westinghouse district representative in this area from May 1, 1953, until August, 1953, and Murphy first became district representative in September, 1953. From May 29, 1953, until October 12, 1953, Westinghouse had no distributor in Colorado and Murphy's efforts in the area were first directed toward contacting distributor prospects. October 12, 1953, Liberty Trucks & Parts Company became its distributor in Colorado. Murphy made his services available to Liberty in order to provide the personnel with a working knowledge of the machinery and to give sales training instruction to Liberty employees. On some occasions Murphy accompanied Liberty salesmen in contacts with prospective customers. At all times, following his appointment as district representative, a very substantial portion of his time was spent outside the State of Colorado. He made written reports of his work to Westinghouse and a number of these reports were admitted in evidence. He lived in Denver because of its convenience and central location, and testified that he spent from five to eight per cent of his working time in Colorado, although he maintained no office in the state. He was paid a fixed salary by Westinghouse and drew no commissions.

In addition to the district representative, Westinghouse employed Vernon Slade as a service engineer during the time in question. Service of process was made on him as "agent and principal employee." The area to which Slade was assigned comprised all the United States west of and including Texas, Oklahoma, Kansas, Iowa, Minnesota, Wisconsin, as well as portions of Canada, Alaska and Hawaii. He was able to cover this large area because of the low machine population. Generally, his duties

were to train and counsel distributors on problems of maintenance, repair, and upkeep of Westinghouse equipment. He worked under direct orders from the factory and was in no way responsible to the distributor.

When Liberty became a distributor in Colorado its employees were not familiar with the equipment and had to be trained to service and maintain it. A mobile service school, which travelled throughout the world for Westinghouse, came to Denver and Slade assisted in setting up demonstrations, the purpose of which was to acquaint Liberty and its customers with Westinghouse equipment. Slade occasionally went with the distributor's service man on a repair job because, "The distributor's service man would go out on the job with full knowledge that he couldn't correct it. He didn't know how to correct it. He had no practical experience at it. At these times it was my duty then to go out with this man and to show him what he was looking for — and there is lots to this big equipment." In a few instances during the period in which Liberty had no trained repair men, they called on Slade to assist in repair work, and no compensation was received by Westinghouse for such service.

Cobusco offered evidence of the policies and activities of LeTourneau, before the sale on May 1, 1953, of its earth-moving assets to the newly organized Westinghouse. This evidence was offered on the theory that there was a continuity of activity between LeTourneau and Westinghouse. The trial court recognized that Westinghouse employed some of the people formerly employed by LeTourneau, who were familiar with earth-moving equipment, and became the owner of property formerly owned by LeTourneau. Accepting this as true, the trial court held that acts of LeTourneau were not relevant or material to the issue, and were not binding upon Westinghouse. This ruling was based upon the fact that Westinghouse was created as a new and separate corporate entity as of May 1, 1953.

Both parties advance considerable argument which involves consideration of the merits of the claim set forth in the third party complaint. In the brief of Westinghouse it is stated that the company "denied liability to Cobusco or Hinman because the liability of the manufacturer, if any, accrued long prior to May 1, 1953." Cobusco argues at some length that the date limitation fixed as May 1, 1953, in the contract to indemnify LeTourneau does not operate to defeat the claim, because Westinghouse assumed all obligations theretofore contracted by LeTourneau. We give no further consideration to these extended arguments for the reason that we are not here concerned with the merit of Cobusco's claim or with any defense that may be asserted.

Questions to be Determined.

First: *Did the trial court err in holding that Westinghouse was not "doing business" in the State of Colorado and therefore was not subject to the jurisdiction of the trial court?*

This question is answered in the negative. We have read numerous opinions written by courts of last resort and conclude that they create a labyrinth of irreconcilable conflicts. Perhaps the one rule which permeates all of the decisions, in which the question as to whether a foreign corporation is doing business in a state other than that in which it was chartered, is that each case depends upon its own facts. *Peoples Tobacco Co. v. American Tobacco Co.,* 246 U.S. 79, 38 S. Ct. 233, 62 L.ed. 587. In *Begole Supplies Inc. v. Pacific Corp.,* 121 Colo. 88, 212 P. (2d) 860, with reference to authorities on the question of doing business, we quoted from *Butler Bros. Shoe Co. v. United States Rubber Co.,* 156 Fed. 1, as follows: "They are numerous, various, and conflicting, and any attempt to reconcile them must fail."

Much argument is devoted by counsel for both parties intended to establish the fact that the claim sought to be enforced by Cobusco arose out of the corporation's activities within the state, or on the other hand, that the

claim asserted did not arise out of corporate activity within the state. In the numerous cases on the subject some opinions are found which seem to indicate that a greater quantum of "doing business" within the state of the forum is essential to jurisdiction where the claim asserted does not arise out of corporate activities within that state, than would be required in a claim arising out of corporate conduct within the state. *Louisville & N. R. Co., v. Chatters,* 279, U.S. 320, 73 L.ed. 711, 49 S. Ct. 329. See also 23 Am. Jur. 504, sec. 496.

While this court has not, in so far as we are advised, specifically adopted any such rule we do find language which has been construed to favor that view. In *Colorado Iron Works, v. Sierra Grande Mining Co.,* 15 Colo. 499, 25 Pac. 325, the Colorado court assumed jurisdiction over a foreign corporation where the cause of action arose out of a contract entered into in Colorado by the terms of which payment was required in Colorado by the foreign corporation. In sustaining jurisdiction this court said, inter alia:

*"Nor do we deem it necessary that the acts of appellee should be construed to be doing business in this state, outside of the transaction in question, to render it in this case amenable to its courts and subject to its laws.* * * * A foreign corporation can, as in this instance, buy of a domestic manufacturing corporation the same as a natural person, and contract a debt for the articles so bought. In order to invoke the aid of our own courts in the collection of such debt, it is not necessary for a citizen of this state to show that the debtor was doing business generally in this state, but that he is a debtor; that the debt is due and payable here; and the debtor, whether a natural or an artificial person, if brought by process within the jurisdiction, is amenable to our courts."

We think that the question as to whether a claim upon which suit is brought arose out of activity of a foreign corporation within the state of the forum, is

a proper subject of inquiry as shedding light on the question as to whether the corporation is "doing business" within the state in such a manner as to make it amenable to process. Every case must depend on its own facts, and one of the facts to be considered in determining the ultimate question is whether the claim arose out of corporate activity within the state of the forum. Under some circumstances the determination of that question might be most persuasive, and under other conditions it might be of no consequence. We are satisfied that the trial court considered the evidence bearing upon this question in its proper relationship to the issue, and correctly interpreted pertinent language of the Supreme Court of the United States in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S. Ct. 154, 90 L.ed. 95; and *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.ed. 485.

 Jurisdiction over persons and corporations who are made defendants in actions in personam is based upon the concept of "presence within the state." In the case of foreign corporations "presence" has been construed to mean doing business within the state. In *International Harvester Co. v. Kentucky,* 234 U.S. 579, 34 S. Ct. 944, 58 L.ed. 1479, we find the following apt statement:

"For some purposes a corporation is deemed to be a resident of the state of its creation; but when a corporation of one state goes into another, in order to be regarded as within the latter it must be there by its agents authorized to transact its business in that state. The mere presence of an agent upon personal affairs does not carry the corporation into the foreign state. It has been frequently held by this court, and it can no longer be doubted, that it is essential to the rendition of a personal judgment that the corporation be 'doing business' within the state."

In *Junior Frocks v. District Court,* 105 Colo. 82, 94 P. (2d) 694, we quoted with approval from an opinion of

the Supreme Court of the United States the following:

"The question as to what constitutes the doing of business in such wise as to make the corporation subject to service of process has been frequently discussed in the opinions of this court * * *. Each case depends upon its own facts. The general rule deducible from all our decisions is that the business must be of such nature and character as to warrant the inference that the corporation has subjected itself to the local jurisdiction, and is by its duly authorized officers or agents present within the state or district where service is attempted."

The trial court committed no error in concluding that under all the circumstances shown, Westinghouse was not so continuously and substantially operating in Colorado as to be "doing business" in Colorado. *Begole Supplies Inc. v. Pacific Corp., supra.*

Second: *Did the trial court err in excluding testimony concerning the activities and policies of LeTourneau, the predecessor in interest of Westinghouse?*

█ This question is answered in the negative. In determining whether Westinghouse is amenable to the jurisdiction of Colorado courts, the court must look to the activities of Westinghouse at the time service was made, and not to the activities of a totally different corporation a year and more before service was made on Westinghouse. What policies LeTourneau established before and after May 1, 1953, what its employees did, what they said — none of this was relevant and none of it binding upon Westinghouse. The applicable rule is considered at length in *Jones Commentaries on Evidence,* Vol. 2, 2d Ed., sec. 611, page 1131, from which we quote the following:

"In its relation to relevancy, the maxim, res inter alios acta alteri nocere non debet — a transaction between two parties ought not to operate to the disadvantage of a third party — becomes of first importance by reason of its practical utility to prevent a litigant party from being affected by the acts of third parties. The question of

relevancy less frequently arises when the offered proof relates to transactions which have transpired directly between the plaintiff and defendant; but it is constantly arising when the effort is made to prove the acts and declarations of strangers or of one of the parties to the action in his dealings with strangers. Such evidence, in general, 'it would be manifestly unjust to admit, since the conduct of one man under certain circumstances or towards certain individuals, varying as it will necessarily do according to the motives which influence him, the qualities he possesses and his knowledge of the character of those with whom he is dealing, can never afford a safe criterion by which to judge of the behavior of another man similarly situated, or of the same man toward other persons.' "

The judgment is affirmed.